J-S36002-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.J.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.C.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 916 MDA 2024 |

Appeal from the Decree Entered May 28, 2024
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-9180

| | | |
|---|---|---|
| IN THE INTEREST OF: A.C.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.C.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 917 MDA 2024 |

Appeal from the Decree Entered May 28, 2024
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-9181

BEFORE:  LAZARUS, P.J., McLAUGHLIN, J., and BENDER, P.J.E.

MEMORANDUM BY LAZARUS, P.J.:                    **FILED: DECEMBER 6, 2024**

J.C.P. (Father) appeals from the decrees,[1] entered in the Court of Common Pleas of Luzerne County Orphans' Court Division, involuntarily terminating his parental rights to his two daughters, M.J.P. (born February

_____

[1] On July 22, 2024, our Court *sua sponte* consolidated the above-captioned appeals

. *See* Pa.R.A.P. 513.

2012) and A.C.P. (born November 2007) (collectively, Children).  After careful review, we affirm.

Father has been incarcerated since February 8, 2016—after being convicted of homicide by motor vehicle–DUI related.  *See* N.T. Termination Hearing, 3/1/23, at 50.  In October 2016, Children were removed from Mother's[2] care following allegations of domestic violence between Mother and her live-in paramour, who is also the biological father of Children's half-sibling.[3]  When police arrived at Mother's home, they found Mother, in Children's presence, highly intoxicated and with dried blood on her forehead.  Children were placed in the emergency custody of Luzerne County Children and Youth Services (CYS) via an emergency shelter care order.

Because Father was incarcerated at the time of placement, he was not a resource for Children.  The only plan that CYS set forth for Father was for him to engage in a CYS assessment upon his release from prison.  Father's maximum date of release was January 2024; at the time of the last termination hearing he had been denied parole three times and was scheduled for another parole hearing in October 2023.  At the time of the termination hearings, Father had completed all correctional programs required of him in the prison system, *id.* at 47-52, 106, including a therapeutic community and violence prevention program, an educational program where Father obtained

_____

[2] The court also terminated Mother's parental rights to Children.  However, she is not involved in this appeal.

[3] Half-sibling, J.S., was born in January of 2016.

- 2 -

his G.E.D., a veterans program, and an intensive drug and alcohol program. *Id.*, 4/18/22, at 50-55.

Children were declared dependent on November 23, 2016. CYS commenced monthly prison visits between Children and Father; however, the visits ended in 2020 because of the COVID-19 pandemic. Although in-person visits have not resumed since the pandemic, Father has been permitted to have 10-15 minute telephone calls with Children and, in March 2022, the court granted Father video visits with Children. *Id.* at 89. Two times during their placement, Father filed petitions to increase his visits with Children and change the visits from telephonic to video visits. *Id.* at 106, 157-59.

In June 2019, Children and J.S. were placed in kinship care at the home of maternal aunt and uncle, also a pre-adoptive home. Permanency hearings were held every 6 months; the goal remained reunification. On July 13, 2021, CYS filed petitions to involuntarily terminate Father's rights to Children

pursuant to 23 Pa.C.S.A. §§ 2511(a)(1) and (b)[4] of the Adoption Act.[5]  In

October 12, 2021, CYS filed amended termination petitions, now seeking

termination under §§ 2511(a)(2), (5), (8) and (b).

On March 2, 2022, the trial judge conducted *in camera* interviews of

Children.  A.C.P., who was in eighth grade at the time, told the judge that

from age six she "grew up way too fast" and "was around things [she]

_____

[4] § 2511.  Grounds for involuntary termination

**(a)** **General rule.**--The rights of a parent in regard to a child
may be terminated after a petition filed on any of the
following grounds:

\*     \*     \*

(2) The repeated and continued incapacity, abuse, neglect
or refusal of the parent has caused the child to be without
essential parental care, control[,] or subsistence necessary
for his physical or mental well-being and the conditions and
causes of the incapacity, abuse, neglect[,] or refusal cannot
or will not be remedied by the parent.

\*     \*     \*

**(b) Other considerations.**--The court in terminating the rights
of a parent shall give primary consideration to the developmental,
physical and emotional needs and welfare of the child.  The rights
of a parent shall not be terminated solely on the basis of
environmental factors such as inadequate housing, furnishings,
income, clothing[,] and medical care if found to be beyond the
control of the parent.  With respect to any petition filed pursuant
to subsection (a)(1), (6) or (8), the court shall not consider any
efforts by the parent to remedy the conditions described therein
which are first initiated subsequent to the giving of notice of the
filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(2) and (b).

[5] 23 Pa.C.S.A. §§ 2101-2938.

- 4 -

shouldn't have seen." N.T. Termination Hearing, 3/2/22, at 9. A.C.P. testified that her parents "wouldn't even be able to handle" parenting her, that they "haven't been [her] parents in years," that she "cannot go back to liv[ing] with [her] mom or [her] dad," that she "want[s] to live with [her] aunt and uncle and [her] siblings as a family," and that her aunt and uncle "are . . . basically" her mom and dad to her. *Id.* at 8, 13. A.C.P. also told the trial judge that even though Father is her biological dad, she "do[esn't] really want . . . a close personal or anything bond." *Id.* at 22.

The court held three days of termination hearings on April 18, 2022, May 9, 2022, and March 1, 2023. CYS caseworker Krista Dean testified, as well as court-appointed special advocates (CASA) Amy Martin and Sarah Harris/Mule, SCI-Dallas corrections counselor Joseph DeLuca, Mother, and Father. July 2022, A.C.P. ran away from her kinship home and later was admitted to a mental health facility in Pittsburgh for three weeks of treatment. *See* N.T. Termination Hearing, 3/1/2023, at 13. A.C.P. was diagnosed with post-traumatic stress disorder, oppositional defiant/major depressive disorder with psychosis, and anxiety. *Id.*, 3/1/23, at 13-14. As a result of her significant mental health issues and need for specialized treatment, on July 29, 2022, A.C.P. started living with her half-sister and her husband—a new kinship, pre-adoptive home. *Id.* at 5, 14.

In January 2023, A.C.P. was hospitalized for 14 days after her new kinship parents noticed she was cutting herself. *Id.* at 15. At the time of the March 2023 termination hearing, A.C.P. was in ninth grade, attending

outpatient mental health treatment, and working a part-time job at McDonald's. *Id.* at 19-20.

Following the hearings, on August 18, 2023, the court entered decrees terminating Father's parental rights to Children pursuant to subsections 2511(a)(2) and (b). Father filed a direct appeal. On appeal our Court vacated the termination decrees and remanded the matter "for the *limited purpose* of . . . determin[ing] whether Attorney [Joseph] Mashinski was appointed as Children's guardian *ad litem* (GAL) and legal counsel and, if so, whether he could represent the Children's dual interests without conflict[, pursuant to 23 Pa.C.S.A. § 2313(a)]." *In the Interest of M.J.P. & A.C.P.*, 1292 MDA 2023 & 1293 MDA 2023 (Pa. Super. filed March 27, 2024) (unpublished memorandum decision). On remand, the trial court held a hearing on April 3, 2024, at which time it clarified that it was the court's intention to appoint Attorney Mashinski as GAL and as legal counsel for Children. *See* Trial Court Opinion, 7/24/24, at 3. The court then reappointed Attorney Mashinski as Children's counsel of record. *Id.* at 3-4. Critically, the court also made an on-the-record determination that counsel was able to represent the best interests and legal interests of Children without any conflict. *Id.* at 4. The court then reentered the decrees terminating Father's parental rights.

Concurrently, Father filed the instant, timely notice of appeal and Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i). On appeal, he presents the following issues for our consideration:

(1)    Whether the [t]rial [c]ourt abused its discretion and/or committed an error of law in determining whether the parental rights of [Father] to [C]hildren should be terminated pursuant to 23 Pa.C.S.A. § 2511(a)(2)[?]

(2)    Whether the [t]rial [c]ourt abused its discretion and/or committed an error of law in determining the tenets of 23 Pa.C.S.A. § 2511(b) have been satisfied and the best interests of [C]hildren served by terminating the parental rights of [Father?]

Appellant's Brief, at 4.

We review involuntary termination orders for an abuse of discretion, which our Supreme Court has explained "is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). An appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 587.

Father first asserts that termination was improper under subsection 2511(a)(2) "where the evidence produced at trial demonstrates [Father] has successfully exerted every effort to address [the] concerns of CYS." Appellant's Brief, at 6. In particular, Father states that CYS "never saw fit to

- 7 -

complete [its required] assessment with [him] *during* the course of his incarceration[, n]or did it even go so far as to work with [him] to develop a 'living plan' as to his intentions upon release." ***Id.*** at 8 (emphasis in original). Father also contends that where, at the time of the last termination hearing he had, at most, a mere 10 months remaining on his sentence before his release, "it was this very incarceration—in and of itself—that formed the central thesis for CYS's desire to terminate [his] parental rights." ***Id.***

***In re Adoption of S.P.***, 47 A.3d 817 (Pa. 2012), is the seminal case regarding termination of parental rights, under subsection 2511(a)(2), in the context of incarcerated parents. In that case, the father had been incarcerated (for third-degree murder) since child's birth and, as a result, had no relationship with child. ***Id.*** at 820. Father was sentenced to five to ten years in prison. ***Id.*** at 819. Father had never sent the child any prison earnings or otherwise provided for her. ***Id.*** at 819-20. As a result of these facts, the trial court concluded that "Father does not currently have the ability to be [] a caregiver, nor is it clear when in the future, if ever, he will be capable of doing so." ***Id.*** at 820.[6] Accordingly, the trial court terminated father's parental rights to child under subsection 2511(a)(2), recognizing that "even though there was no affirmative act of [f]ather that resulted in [c]hild being forced into foster care, [f]ather admitted that his incarceration resulted in

_____

[6] The trial court also noted that another major factor supporting termination under subsection 2511(a)(2) was the fact that child had special needs which required an around-the-clock caregiver "who can provide almost constant attention to her needs." ***Id.***

[c]hild's placement because his absence caused her to be without essential parental care and control." *Id.*

In determining that termination was appropriate under subsection 2511(a)(2), the Supreme Court in *S.P.* "definitively h[e]ld" that

> [I]ncarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing essential parental care, control[,] or subsistence and the length of the remaining confinement can be considered as highly relevant to whether the conditions and causes of the incapacity, abuse, neglect[,] or refusal cannot or will not be remedied by the parent, sufficient to provide grounds for termination pursuant to [subsection] 2511(a)(2).

*Id.* at 830 (quotation marks omitted).[7] Even in cases where an incarcerated parent utilizes all available resources in prison, the Court found that termination may still be warranted where that parent remains incapable of parenting a child. *Id.* at 827. *See also In re Adoption of J.J.*, 515 A.2d 883, 891 (Pa. 1986) (citation omitted) ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.").

At the time of the termination hearing, Children had been in placement for almost 5 years. A.C.P., who was almost fourteen and one-half years old at the time, acknowledged the toll that placement had taken on her, stating:

> I mean, what I really need to stress is that like I—like all of this whole thing has been going on a really long time, like six years; since I was a kid. I'm going into high school next year and it started in elementary [school]. That's like a really long time. This

---

[7] The Supreme Court in *S.P.* also found that termination was proper based, in part, on the fact that the father had no plan for obtaining housing, employment, or transportation upon his parole. *Id.* at 831.

needs to be over soon, and if you're not going to terminate their rights then I shouldn't go back. I mean, I don't want to obviously, but it's like I don't understand why I'm still in foster care.

N.T. Termination Hearing, 3/2/22, at 14-15. A.C.P. also told the trial judge that she would consent to be adopted by her kinship family, *id.* at 13, and Children's CASAs testified that Children need permanency and stability and that they wish to be adopted by their kinship parents.[8] *Id.*, 5/9/22, at 29-30, 33-34, 41-42, 46; *id.*, 3/1/23 at 32-34. *See* 23 Pa.C.S.A. § 2711(a)(1) (an adoptee over age of 12 must consent to adoption). A.C.P. told the trial judge that while Father does not blame things on Children, he has not been accountable for his imprisonment or acknowledged that what he has done with his life has affected Children negatively. *See* N.T. Termination Hearing, 3/2/22, at 28.[9]

M.J.P., who was ten years old at the time of the hearings, told the trial judge, *in camera*, that she wants to be adopted, *id.* at 36, 41, that when she lived with Father, he and Mother fought and yelled, *id.* at 38, and that she does not know Father well. *Id.* M.J.P. testified that she wants to live with her kinship parents—maternal aunt and uncle—and that it would make her "happy" if they became her mom and dad. *Id.* at 39, 42. M.J.P. also stated that she would not be sad if she were adopted and could not see Father

_____

[8] At the time of the final termination hearing, held in May 2023, A.C.P. was with a new kinship family, also a pre-adoptive resource. *See supra* at 3-4.

[9] Father, however, accepted responsibility "for making a bad choice and [ending] up in prison." *Id.*, 4/18/22, at 167; *id.* (Father acknowledging that "It wasn't fair for [Children] when they had a situation going on with [Mother] and her abusive boyfriend [and that i]f [he] would have been there, [he didn't] think [they would all] be having this conversation right now.").

anymore. *Id.* at 40. Further, M.J.P. told the trial judge that she does not have fun during her weekly telephone conversations with Father because "[t]here's nothing to talk about." *Id.* at 44. Finally, M.J.P. stated that she "[doesn't] know [Father]" and that she has no desire to continue phone contact with Father. *Id.* at 44-45.

"[W]e are not willing to completely toll a parent's responsibilities during his or her incarceration," and a parent has an affirmative "duty to utilize available resources to continue a relationship with his or her child." *In re: Adoption of McCray*, 331 A.2d 652, 655 (Pa. 1975). Here, Father undeniably visited consistently with Children in an attempt to maintain a place of importance in their lives. Those visits were initially in-person in prison, then, during the pandemic, switched to telephonic visits, and then, finally, became video visits. Father also voluntarily completed all courses available to him in prison and even petitioned the court twice to increase the quantity and quality of his visits. While there is no doubt that the COVID-19 pandemic had a significant impact on Father's ability to maintain a bond and foster a relationship with Children, the bottom line is that Children have been in placement for a long time and are yearning for a stable home in a secure and positive environment.

In *In re D.C.D.*, 105 A.3d 662 (Pa. 2014), our Supreme Court found that there was no justification for delaying permanency for a dependent child, under section 2511 of the Adoption Act, due to the failure of an agency to provide reasonable services to a incarcerated parent. In *D.C.D.*, the father:

- 11 -

was serving an aggregate sentence of 7¾-16 years' incarceration; had attempted to establish a relationship with child by seeking video and in-person visits; had sent child gifts and cards; had made inquiries about child to CYS; corresponded with and received photos from child's foster parents; had corresponded regularly with caseworkers; and "generally tried to be a part of [c]hild's life." *Id.* at 664, 666. Even though the trial court found that the "dearth of visits between [f]ather and child was inconsistent with the trial court's prior instructions to CYS to permit visitation at the prison," because father and child never had a bond and father's incarceration was for a long term, the agency's lack of assistance was not relevant to whether father's incapacity "cannot or will not be remedied" by him under subsection 2511(a)(2). *Id.* at 672. The Court also noted that, even in such cases where there is a parent-child bond and a short period of incarceration for the parent, those facts would still "not transform the provision of reasonable efforts to reunite parents and children into a requirement for termination." *Id.* at 672.

Here, there is no demonstrated bond between Father and Children. Moreover, while at the time of the termination hearing there may have been less than one year remaining until Father's maximum release date, the fact remains that he has been in prison for over four years since Children were put in placement and he has not provided for their well-being during that entire period. Moreover, Children are thriving in their pre-adoptive kinship homes, where their emotional, physical, and developmental needs are being met. *See* N.T. Termination Hearing, 3/1/23, at 41 (CASA testifying A.C.P. "has the

support and stability that she's [] been looking for over the course of her years in placement"). Children have clearly expressed their desire to be adopted, maintain that they no longer wish to talk to Father, *id.*, 3/2/22, at 21, have no desire for a close personal relationship or bond with Father, *id.* at 22; *id.*, 3/1/23, at 35-37, and state that they would have no problem if Father's parental rights were terminated. *Id.*, 5/9/22, at 18. *See also* N.T. Termination Hearing, 5/9/22, at 31-32 (A.C.P.'s CASA testifying A.C.P. does not wish to maintain any relationship with Father).

"A parent's basic constitutional right to the custody and rearing of his . . . child is converted, upon the failure to fulfill his . . . parental duties, to the child's right to have proper parenting and fulfillment of his . . . potential in a permanent, healthy, [and] safe environment." *In re B., N.M.*, 856 A.3d 847, 855-56 (Pa. Super. 2024). We cannot ignore the fact that Father's criminal conduct, resulting in a lengthy prison sentence, indirectly caused Children to be declared dependent and put in placement when custody was taken away from Mother. Simply put, through his own actions, Father has been unable to remedy parental incapacity for the last seven years. *See* 23 Pa.C.S.A. § 2511(a)(2). Thus, we conclude that CYS proved, by clear and convincing evidence, that termination of Father's parental rights was proper under subsection 2511(a)(2). *See D.C.D.*, *supra*; *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (termination under subsection 2511(a)(2) emphasizes child's present and future need for essential parental care, control, or subsistence necessary for physical and mental well-being).

If the trial court determines the petitioner established grounds for termination under subsection 2511(a) by clear and convincing evidence, then the court must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. ***See In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). Subsection 2511(b)'s "pivotal language . . . mandates that the court . . . "shall give primary consideration to the developmental, physical[,] and emotional needs and welfare of the child." ***In the Int. of K.T.***, 296 A.3d 1085, 1105 (Pa. 2023). In ***K.T.***, our Supreme Court stated:

> Notably, courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> \* \* \*
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.
>
> \* \* \*
>
> Moreover, the child's "emotional needs" and "welfare" include "intangibles such as love, comfort, security, and stability." As further guidance, we have identified factors, i.e., specific needs and aspects of the child's welfare, that trial courts must always consider. The court must consider "whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which "is not always an easy task."

***Id.*** at 1105-06 (internal quotation marks and citations omitted).

Here, Father contends that the court improperly terminated his parental rights under subsection 2511(b) where he has "historically maintained [] constant and regular contact with his daughters *despite* his incarceration at SCI-Dallas." Appellant's Brief, at 14 (emphasis in original). Moreover, Father finds it "disingenuous [that CYS] offer[s] testimony as to a lack of bond between [Father] and his daughters[, n]otwithstanding every seeming effort on the part of that Agency to frustrate their relationships." *Id.* at 15.

Instantly, CYS caseworker Krista Dean and CASAs Amy Martin and Sarah Mule/Harris testified that terminating Father's rights would not destroy an existing, necessary, and beneficial relationship with Children. *In re C.S.*, 761 A.3d 1197, 1202 (Pa. Super. 2000). *See* N.T. Termination Hearing, 4/18/22, at 114 (CYS caseworker Dean testifying Father has not been able to foster positive relationship with Children during incarceration); *id.* at 115 (due to short length of phone call visits, Children unable to establish bond with Father). CYS caseworker Dean also testified that Children would not suffer harmful or detrimental effects if Father's parental rights were terminated. *Id.*, 5/9/22, at 12-13.

Conversely, M.J.P.'s CASA testified that there *is* a "definite bond there, a strong bond" between M.J.P. and her kinship family, *id.*, 5/9/22, at 42, and A.C.P.'s CASA stated that A.C.P. has finally found the "support and stability" she had been looking for with her current kinship family. *Id.*, 3/1/23, at 41-42. Children are thriving in their pre-adoptive kinship homes, where their emotional, physical, and developmental needs are being met. *See id.*, at 34-

35 (CASA testifying A.C.P. has made it "very clear" she wishes to remain with kinship family and wants them to adopt her). Notably, both M.J.P. and A.C.P. require significant therapy given the trauma they have suffered at the hands of parents. Both kinship families are ensuring that Children receive the mental health treatment they need.

Here, where there is no established bond between Father and Children, the benefit of "moving [C]hild[ren] toward a permanent home" favors termination. ***T.S.M.***, 71 A.3d at 253; ***see also D.C.D.***, ***supra***. Children have been searching for the stability, love, comfort, and security of an adoptive family that will provide for their emotional needs and welfare. Because they have each found a pre-adoptive home with a kinship family with whom they have bonded, we conclude that the trial court did not err in terminating Father's parental rights under section 2511(b).

Decrees affirmed.[10]

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/06/2024

---

[10] As acknowledged **supra**, there is no statutory requirement that CYS provide reasonable efforts prior to terminating parental rights under section 2511. **D.C.D.**, **supra**. However, as the Court recognized in **D.C.D.**, under subsection 2511(a)(2), "an agency's lack of assistance to a parent [is] relevant to whether a parent's incapacity 'cannot or will not be remedied by the parent.'" **Id.** at 672. Keeping that premise in mind, we must denounce CYS's apparent failure to keep Father apprised of Children's well-being while in placement, especially where he was not able to see Children, either in person or via video visits, during the pandemic. Moreover, we find the agency's lack of effort to institute video visits during the pandemic less than reasonable.